DECISION AND JUDGMENT ENTRY
Curtis A. Jordan appeals his conviction for Aggravated Robbery, in violation of R.C. 2911.01(A)(1), by the Scioto County Court of Common Pleas. He first argues that his conviction is supported by insufficient evidence because the identification of Jordan by the victim is suspect and because of the lack of physical evidence. We disagree, because we find that the state presented evidence that, if believed, would convince the average mind of Jordan's guilt beyond a reasonable doubt. He next argues that his conviction is against the manifest weight of the evidence because the trier of fact clearly lost its way in believing the victim's testimony that Jordan attacked her. We disagree because we find, upon a thorough review of the record, that the jury did not clearly lose its way and create a manifest miscarriage of justice in resolving conflicts in the evidence. Accordingly, we affirm the judgment of the trial court.
 I.
The grand jury indicted Jordan for aggravated robbery, a violation of R.C. 2911.01(A)(1). After he pled not guilty, Jordan filed a notice of alibi pursuant to Crim.R. 12.1. The state alleged that Jordan robbed Julia Ramey at knifepoint on May 13, 2000.
At trial, Ramey testified that she went to a convenience store, the Super Quik, at about 8:15 or 8:20 a.m. on May 13, 2000. As she came out of the Super Quik, a man approached her from behind and grabbed for her purse. She resisted until he put a butcher knife to her face and cut her. She then struggled to get her purse and give it to the man. According to Ramey, the man said "Give me your purse, bitch, or I'll cut you."
Ramey testified that after the police arrived, she told them that she could identify the man if she saw him again. She testified that she saw the man's face and that he was wearing a ball cap.
Ramey explained that her purse contained a bank envelope with approximately thirteen hundred dollars in cash in fifty and one hundred dollar bills and her billfold, which contained her diver's license, her credit cards, and pictures of her children.
A few days after the robbery, Ramey viewed a photo line up. She testified that she was told not to pick anyone unless she was one hundred percent sure that the photo was of the man who robbed her. She explained that she checked "unsure" on the form because she was not one hundred percent sure. At trial, Ramey testified that she had no doubts that Jordan was the man who robbed her. She explained that the photo from the line-up did not look exactly like Jordan did at the time of the trial. She also testified that the man who robbed her had a scar on his left arm. At the state's request, the trial court ordered Jordan to show the jury his left arm. Ramey admitted that she did not tell the police about the scar until after she had identified Jordan at his preliminary hearing.
Michael J. Hamilton, a Portsmouth Police Officer, testified that he was the first officer to respond to the report of the robbery. He testified that Ramey told him that she could identify her attacker.
Regina Chabot testified that she works next door to the Super Quik and as she was arriving at work on May 13, 2000 at 8:30 a.m., she noticed a suspicious person wearing a baseball cap walking towards the Super Quik. She noticed that he was standing with his back to the corner of the Super Quik building and looked quickly around the corner two or three times. She said the she was about fifty percent sure that Jordan was the man she saw that day. She admitted that she picked someone other than Jordan from a photo array, but later she had reservations about her choice.
Jerry Howard testified that he found a purse on Jeff Dever's driveway as he arrived to do yard work at Dever's home. He picked up the purse and immediately noticed a knife inside. He gave the purse to Dever, who discovered the purse belonged to Ramey. Dever corroborated Howard's testimony and explained that he did not know how the purse got on his driveway.
Jeff Bobo, of South Portsmouth, Kentucky, testified that he owns a red truck, which was stolen on May 10, 2000 from his driveway. The truck was recovered about a month later with damage to its right side. He found a woman's wallet with Ramey's driver's license in the truck. His son's friend, Shawn Robinson, knew the woman and contacted her. A few days later, Robinson, Ramey and another person picked up the wallet.
Shawn Robinson testified that he knows both Jeff Bobo and Julia Ramey. He testified that he talked to Bobo about a wallet found in Bobo's recovered truck. He explained that he recognized Ramey and her children from a picture in the wallet because they come into the Kroger store where he works. He accompanied Ramey and a detective to get the wallet from Bobo's house.
Dorothy Fletcher testified that Jordan admitted a robbery to her on May 13, 2000. She admitted that she had recently been convicted of robbery and sentenced to seven years in prison. She also admitted that she had also been convicted of three or four theft charges and that she had a drug problem since she was a teenager. She explained that the only consideration she received for her help in this case was the prosecutor's agreement, once she had been sentenced, to recommend judicial release after she serves five of her seven-year sentence for her robbery conviction.
Fletcher testified that she met Jordan a few months before his trial. She explained that on May 13, 2000, she was at Jordan's father's house and had spent the previous night there. At about 8:30 a.m., Jordan came to the house and shut all the doors and windows. He had money that he began to count. She noticed that the cash was all fifty and one hundred dollar bills. According to Fletcher, Jordan gave her two of the one hundred dollar bills to buy crack cocaine. After she purchased the crack cocaine, she returned to the house and began using the crack cocaine with the others. She heard Jordan tell James Washington that he had robbed someone and gotten about twelve hundred and fifty dollars. She couldn't remember his exact words but could remember that he said there were detectives looking for him because he had just robbed a Quick Stop or Quick Shop. She also heard him say that he pushed down a female. Later, Jordan again gave her two hundred dollars to get more crack cocaine. Once she returned, Fletcher saw Jordan's girlfriend, Misty Rowles, come to the house at about 11:30 or noon. Jordan and Rowles went into another room. Fletcher testified that after Rowles left, Jordan gave her another hundred dollars to purchase crack. She made the purchase and gave the crack to Jordan.
Fletcher testified that she spoke with Sergeant Brewer of the Portsmouth Police Department on May 20, 2000. She told him the same story except that she said that another person had bought the crack cocaine. She also told him that Jordan had been driving a small red truck from Kentucky and Jordan told her he had stolen it. According to Fletcher, Jordan had damaged the passenger side of the truck after he had stolen it.
Fletcher recognized the knife presented to her at trial as a knife that had been in Jordan's father's house prior to the robbery.
Carl Compton, a sergeant with the Portsmouth Police Department, testified that he impounded Bobo's truck after he discovered it in an apartment complex in the same block of Fourteenth Street as Jordan's father's house.
Detective Sergeant Lynn Brewer of the Portsmouth Police Department testified that he responded to a report of a robbery on May 13, 2000. He explained that he helped in the search for the perpetrator, but did not find him. About a week later, Fletcher approached him in the courthouse and the next day she spoke to him about this case. He explained that in his conversation with Fletcher, she claimed that Jordan had given another person the money to buy drugs. Brewer's interview with Fletcher was videotaped.[2] This videotape was played at trial. This tape apparently confirmed that Fletcher told Brewer that someone else had bought the crack cocaine that day.
Brewer explained that he believed Fletcher because she knew details about the crime that were not published and knew about things that the police did not even know (e.g., the truck).
After Brewer's testimony, the state rested. Jordan did not move for a Crim.R. 29 acquittal.
Jordan's only witness was Misty Rowles, his girlfriend and the mother of his two children. She testified that on May 13, 2000, Jordan was with her in Kentucky from seven in the morning until noon. She testified that she had no reason to lie for Jordan. She denied that Jordan gave her jewelry for Mother's Day in 2000 (May 14, 2000). She admitted to lying when she told her stepmother that Jordan had purchased a tennis bracelet for her and pink ice earrings for their daughter. She identified a picture of her children in which her daughter is wearing pink ice earrings. She admitted that once Jordan was arrested, she never told police about his alibi and refused to speak to the prosecutor until she was subpoenaed to appear before the Grand Jury.
After the defense rested, the state presented the testimony of Jill Rowles, Misty Rowles' stepmother. Jill Rowles testified that Misty Rowles told her that Jordan had bought their daughter pink ice earrings. She also testified that Jordan admitted to her over the telephone that he bought the jewelry.
Jordan did not move for a Crim.R. 29 acquittal during the trial. The jury found Jordan guilty of aggravated robbery and the trial court sentenced him accordingly.
Jordan appeals and asserts the following errors:
 I. The trial court record contains insufficient evidence to support a conviction of robbery.
 II. The verdict of the jury was against the manifest weight of the evidence.
 II.
In his first assignment of error, Jordan argues that there was insufficient evidence to support his conviction.
When we review the sufficiency of the evidence, we must examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. The relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Id., citing Jackson v. Virginia (1979),443 U.S. 307.
Initially, we note that Jordan, by failing to move for a judgment of acquittal pursuant to Crim.R. 29(A), waived all but plain error regarding the sufficiency of the evidence. See Crim.R. 29(A); State v. Roe (1989), Ohio St.3d 18, 25. Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." State v. Landrum (1990),53 Ohio St.3d 107, 111. The plain error rule should not be invoked unless, but for the error, the outcome of the trial would clearly have been otherwise. See State v. Underwood (1983), 3 Ohio St.3d 12. Here, we find that there is no plain error.
Assuming arguendo that Jordan had not waived the error, we conclude that the state presented sufficient evidence. R.C. 2911.01 provides:
 (A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
 (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;
* * *.
Ramey's testimony is sufficient evidence, if believed, to convince the average mind of Jordan's guilt beyond a reasonable doubt. Ramey testified that a man told her, "Give me your purse, bitch, or I'll cut you." He used the butcher knife, a deadly weapon, on her by cutting her face. She testified that he took her purse, which contained about thirteen hundred dollars in cash. Ramey testified at trial that she was one hundred percent certain that Jordan was the man who robbed her. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Therefore, we find that the trial court record contains sufficient evidence to support a conviction for robbery. Accordingly, we overrule Jordan's first assignment of error.
 III.
In his second assignment of error, Jordan argues that his conviction is against the manifest weight of the evidence. He contests the credibility of Ramey's identification of Jordan.
In determining whether a criminal conviction is against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial granted. State v. Thompkins (1997), 78 Ohio St.3d 380, 387, citing State v. Martin (1983), 20 Ohio App.3d 172, 175. In making such a determination, we sit as a thirteenth juror. Thompkins at 387, citingTibbs v. Florida (1982), 457 U.S. 31, 42. However, "[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."Thompkins at 387, quoting Martin at 172.
Here, the jury was presented with two competing theories of the crime. The state argued that Jordan committed the crime. It presented Ramey's testimony that although she could not pick Jordan out of a photo array, she was one hundred percent certain at the trial that Jordan was the man who robbed her. Ramey's identification was bolstered by the testimony of Chabot that she was about fifty percent certain that Jordan was the suspicious man who she saw hanging around the Super Quik just prior to Ramey's attack. The state also presented the testimony of Fletcher that Jordan admitted to the robbery and had a large amount of cash immediately after the attack on Ramey. The state attempted to bolster Fletcher's credibility by verifying parts of her story, such as her assertion that Jordan told her that he was driving a stolen truck and that he had damaged the passenger side, through testimony of arguably more credible witnesses, Bobo and Robinson. The state also presented circumstantial evidence that implicated Jordan, i.e., (1) the recovery of Ramey's wallet in a car, which matched the description that Fletcher claimed to have ridden in with Jordan, which Jordan admitted to Fletcher that he stole, and which was recovered near Jordan's father's house; (2) the recovery of Ramey's purse near the Jordan's father's house and the crime scene; and (3) Jordan's purchase of jewelry for his girlfriend and their children even though he was not working.
Jordan argued that he was not the person who robbed Ramey. He questioned the credibility of Ramey's identification of him because she failed to pick him out of a photo array. Jordan also questioned the credibility of Fletcher due to her extensive criminal record and the possibility that she lied to procure favorable treatment in her pending criminal case. Jordan's girlfriend also provided him with an alibi.
After thoroughly reviewing the record, including the transcripts and exhibits, we cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice in resolving conflicts in the evidence. Given Ramey's testimony and identification, the testimony of Fletcher regarding Jordan's admission of the crime, and the testimony supporting Fletcher's assertions, we cannot say that the jury clearly lost its way in determining which theory to believe. Accordingly, we overrule Jordan's second assignment of error.
 IV.
In sum, we overrule both of Jordan's assignments of error and affirm the judgment of the trial court.
JUDGMENT AFFIRMED.
 JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED and Appellee recover of Appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Scioto County Court of Common Pleas to carry this judgment into execution.
If a stay of execution of sentence and release upon bail has been previously granted by the trial court or this court, it is continued for a period of sixty days upon the bail previously posted. The purpose of said stay is to allow appellant to file with the Ohio Supreme Court an application for a stay during the pendency of proceedings in that court. The stay as herein continued will terminate in any event at the expiration of the sixty day period.
The stay shall terminate earlier if the appellant fails to file a notice of appeal with the Ohio Supreme Court in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Ohio Supreme Court. Additionally, if the Ohio Supreme Court dismisses the appeal prior to expiration of said sixty days, the stay will terminate as of the date of such dismissal.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Harsha, J., and Evans, J.: Concur in Judgment and Opinion.
[2] Although this videotape was played at trial, it was not transcribed. App.R. 9(A) allows a "videotape recording of the proceedings" to constitute a transcript, but requires the parties to type or print the portions of the videotape necessary for the appellate court to determine the issues on appeal. Because this videotape is not a "videotape recording of the proceedings," App.R. 9(A) does not apply. Because the contents of the videotape are not at issue, we did not order that it be transcribed. However, the best practice is for the court reporter to transcribe the tape as it is played in the courtroom or for the parties to utilize App.R. 9 (C) or (D) in place of a transcript.